**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| BENEDORTSE, LLC, | ) | |
| | ) | Case No.: |
| Plaintiff, | ) | |
| | ) | Judge: |
| v. | ) | |
| | ) | Magistrate Judge: |
| JPMORGAN CHASE BANK, N.A., | ) | |
| | ) | **JURY DEMAND** |
| Defendant. | ) | |

**COMPLAINT FOR PATENT INFRINGEMENT**

## I. INTRODUCTION

1. Plaintiff BenedorTSE, LLC ("Benedor") brings this action for patent infringement against Defendant JPMorgan Chase Bank, N.A. ("JPMorgan Chase" or "Defendant"), arising from JPMorgan Chase's unauthorized use of Benedor's patented technology for secure electronic transactions over a network. JPMorgan Chase's mobile banking applications, Chase Mobile (Android package com.chase.sig.android) and J.P. Morgan Mobile (Android package com.jpm.sig.android), in conjunction with JPMorgan Chase's supporting authentication, device-trust, transaction-authorization, and payment-provisioning systems (collectively, the "Accused Instrumentality"), infringed U.S. Patent Nos. 9,400,979, 8,463,713, and 8,260,723 (the "Patents-in-Suit"), each entitled "Transactional Security Over a Network," during the relevant damages period, at least by practicing patented methods for validating a customer's registered device, generating an encrypted code from stored user and device identifiers, and transmitting that code over a computer network to obtain an authorization decision for a sign-in, payment, or purchase transaction. Benedor seeks damages for JPMorgan Chase's infringement, including enhanced damages for willful infringement, together with its attorneys' fees and costs.

### A. The Parties

2. Plaintiff BenedorTSE, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Franklin, Tennessee (Williamson County), which is within this judicial district.

3. Defendant JPMorgan Chase Bank, N.A. is a national banking association organized and existing under the National Bank Act, with its main office located at 1111 Polaris Parkway, Columbus, Ohio 43240. *See* JPMorgan Chase Bank, National Association, Institution Profile, Federal Financial Institutions Examination Council, https://www.ffiec.gov/npw/Institution/Profile/852218 (last visited Sept. 10, 2026). JPMorgan Chase Bank, N.A. has made, used, sold, offered for sale, distributed, and supported the accused Chase Mobile and J.P. Morgan Mobile applications and the supporting authentication and transaction-authorization systems throughout the United States, including within this judicial district, and operates numerous full-service Chase retail bank branches within this judicial district.

4. JPMorgan Chase Bank, N.A. is the operating bank that develops, publishes, distributes, operates, and supports the Accused Instrumentality. It is the developer of record for the Chase Mobile and J.P. Morgan Mobile applications on the Google Play Store and the seller of record for the Chase Mobile application on the Apple App Store; it operates the authentication and device-trust systems that perform the accused secure sign-in and transaction-authorization flows for its customers; and it operates the Chase retail bank branches that conduct the bank's banking business in this judicial district under the bank's CHASE name. *See* Chase Mobile, Google Play, https://play.google.com/store/apps/details?id=com.chase.sig.android&hl=en_US (last visited Sept. 10, 2026); J.P. Morgan Mobile, Google Play, https://play.google.com/store/apps/details?id=com.jpm.sig.android&hl=en_US (last visited Sept.

10, 2026); Chase Mobile: Bank & Invest, Apple App Store, https://apps.apple.com/us/app/chase-mobile-bank-invest/id298867247 (last visited Sept. 10, 2026).

### B. Jurisdiction and Venue

5. This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7. This Court has personal jurisdiction over JPMorgan Chase Bank, N.A. because JPMorgan Chase has committed acts of patent infringement in this judicial district, has conducted and does conduct continuous and systematic business in this district, and has purposefully availed itself of the privileges of conducting business in the State of Tennessee, including by making available, distributing, marketing, and supporting the accused Chase Mobile and J.P. Morgan Mobile applications to and for customers in this district, by operating the authentication and transaction-authorization systems that serve those customers, and by operating numerous physical, permanent, employee-staffed Chase retail bank branches in this district.

8. Venue is proper in this judicial district under 28 U.S.C. § 1400(b) because JPMorgan Chase Bank, N.A. has committed acts of infringement in this district and has a regular and established place of business in this district.

9. JPMorgan Chase Bank, N.A. operates numerous full-service Chase retail bank branches within the Nashville Division of the Middle District of Tennessee. Each such branch is a physical, permanent, employee-staffed location of the Defendant at which the Defendant conducts its banking business under the Defendant's CHASE name. JPMorgan Chase Bank, N.A.'s regular and established places of business in this District include, without limitation: (a)

the Green Hills branch (a Chase branch with ATM) located at 3811 Hillsboro Pike, Nashville, Tennessee 37215, in Davidson County; (b) the Church and 4th Ave branch (a Chase branch with ATM) located at 201 4th Avenue North, Suite 150, Nashville, Tennessee 37219, in downtown Nashville, Davidson County; (c) the Cool Springs branch (a Chase branch with ATM) located at 3030 Mallory Lane, Franklin, Tennessee 37067, in Williamson County; and (d) the CityPark Brentwood branch (a Chase branch with ATM) located at 288 Franklin Road, Brentwood, Tennessee 37027, in Williamson County. *See* Green Hills, Chase Branch Locator, https://www.chase.com/locator/banking/us/tn/nashville/3811-hillsboro-pike (last visited Sept. 10, 2026); Church and 4th Ave, Chase Branch Locator, https://www.chase.com/locator/banking/us/tn/nashville/201-4th-ave-n (last visited Sept. 10, 2026); Cool Springs, Chase Branch Locator, https://www.chase.com/locator/banking/us/tn/franklin/3030-mallory-ln (last visited Sept. 10, 2026); CityPark Brentwood, Chase Branch Locator, https://www.chase.com/locator/banking/us/tn/brentwood/288-franklin-rd (last visited Sept. 10, 2026).

10. JPMorgan Chase Bank, N.A. has maintained a regular and established place of business in this District throughout the period relevant to this action. In March 2019, JPMorgan Chase announced that Nashville was one of nine new markets in which it would open retail branches, and it opened its first Nashville-area branches beginning in December 2019. According to the records of the Federal Deposit Insurance Corporation, JPMorgan Chase Bank, N.A.'s Berry and 8th Ave branch at 2645 8th Avenue South, Nashville, Tennessee 37204 (Davidson County) was established on December 17, 2019; its Church and 4th Ave branch was established on July 7, 2020; its Green Hills branch was established on July 16, 2020; its Cool Springs branch

was established on November 3, 2021; and its CityPark Brentwood branch was established on November 28, 2023. *See* Chase Announces Major Branch Expansion in 2019, JPMorgan Chase (Mar. 13, 2019), https://media.chase.com/news/chase-announces-major-branch-expansion-in-2019 (last visited Sept. 10, 2026); JPMorgan Chase Bank, National Association (FDIC Cert. 628), Locations, FDIC BankFind Suite, https://banks.data.fdic.gov/bankfind-suite/bankfind/details/628 (last visited Sept. 10, 2026). JPMorgan Chase also maintains a J.P. Morgan Private Bank office at 201 Demonbreun Street, 12th Floor, Nashville, Tennessee 37203, employs approximately 400 people in the Nashville area, and in May 2026 announced a lease of approximately 51,000 square feet of office space at 1600 West End Avenue, Nashville, Tennessee, in the Broadwest development, which is to carry J.P. Morgan signage. *See* Our Nashville, TN Office, J.P. Morgan Private Bank, https://privatebank.jpmorgan.com/nam/en/locations/united-states/tennessee/nashville (last visited Sept. 15, 2026); JPMorgan Chase to Add Name to Nashville Skyline, Nashville Post (May 29, 2026), https://www.nashvillepost.com/business/jpmorgan-chase-to-add-name-to-nashville-skyline/article_d8473abf-2046-4e6f-8ba9-efa8c8d1a1a4.html.

11. JPMorgan Chase Bank, N.A. has committed acts of infringement in this District by, among other things, making available, distributing, and supporting the accused Chase Mobile and J.P. Morgan Mobile applications to and for customers located in this District, and by operating the authentication and device-trust systems that performed the accused secure sign-in and transaction-authorization flows for those customers each time a customer in this District signed in to, and conducted transactions through, the Accused Instrumentality during the relevant damages period. Customers in this District have, during the relevant period, used the Chase Mobile and J.P. Morgan Mobile applications to obtain authorized access to their accounts and to

make payments and conduct transactions, each such use being an act of infringement of the Patents-in-Suit committed in this District.

## II. FACTUAL BACKGROUND

### A. State of the Art Prior to the Benedor Inventions

12. Prior to December 1, 2000, the growth of electronic commerce and electronic banking was hampered by the lack of convenient and secure systems for authenticating users and authorizing transactions over a network. Most online transactions relied on single-factor authentication, typically a username and password, which was widely recognized as an insufficient security measure against theft and fraud.

13. Prior to December 1, 2000, a common method for securing data in transit was the Secure Sockets Layer protocol. But SSL only encrypted the communication channel between a user and a server. Once the data arrived at the receiving server, it was commonly decrypted, exposing the user's sensitive personal and financial information and leaving it vulnerable in the server's database.

14. Advanced but commercially unsuccessful protocols such as the Secure Electronic Transaction (SET) protocol were developed to prevent recipients from seeing customer credit card numbers. SET, developed beginning in 1996 by Visa, Mastercard, IBM, Microsoft, Netscape, and other industry participants, required a complex public-key infrastructure including the issuance of digital certificates to consumers, and was widely viewed as too cumbersome for widespread adoption. By 2000, SET had largely been passed over in favor of SSL, leaving a need for a more practical solution that could protect a user's information end-to-end and tie a transaction to a specific user device.

15. While multi-factor authentication was a known security concept, its use in consumer e-commerce and consumer banking was not conventional or widespread. Existing solutions were generally limited to niche, high-security enterprise or banking environments.

16. Using a user's own computer or mobile device as an authentication factor by automatically reading a unique hardware identifier from the device, and validating that the device is one permitted for the user, was not a routine or conventional practice. Conventional systems did not treat the user's personal computing device itself as a security token bound to the user's account.

17. In the then-prevailing model, the user device did not typically combine multiple pieces of user and device information and mathematically scramble them into a single-use secure code for a specific transaction for verification by a trusted entity.

18. As of December 1, 2000, a technological gap existed for a secure, practical, and convenient system for electronic transactions and account access. No conventional or widely adopted technology existed that could simultaneously protect a user's sensitive information, bind the user to a specific device, and generate a unique encrypted credential on the user's device for a single transaction authorization request.

**B. The Plaintiff and the Benedor Inventions**

19. Richard F. Carrott was the founder of Benedor and is the sole named inventor on each of the Patents-in-Suit. In the early 2000s, Mr. Carrott sought to address the security risks inherent in online transactions and account access, including the requirement that users transmit sensitive personal and financial information across a network and the inability of then-existing systems to bind a transaction to a specific user device.

20. Mr. Carrott conceived of and developed a novel system that avoided the transmission of sensitive personal information while still enabling robust, positive verification of

both the user and the user's device. The patented system securely links a user's account to a specific device, generates secure encrypted identifiers, and facilitates network-based transaction authorization without exposing confidential payment data.

21. Mr. Carrott filed U.S. Application No. 09/726,304 on December 1, 2000 (the "Original Application"). Each of the Patents-in-Suit claims priority, through a chain of continuing applications, to the Original Application.

**C. The Patents-in-Suit**

22. On July 26, 2016, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,400,979 (the "'979 Patent"), entitled "Transactional Security Over a Network." A true and correct copy of the '979 Patent is attached as Exhibit A.

23. On June 11, 2013, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,463,713 (the "'713 Patent"), entitled "Transactional Security Over a Network." A true and correct copy of the '713 Patent is attached as Exhibit B.

24. On September 4, 2012, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,260,723 (the "'723 Patent"), entitled "Transactional Security Over a Network." A true and correct copy of the '723 Patent is attached as Exhibit C.

25. The '979, '713, and '723 Patents are members of the same patent family, share a common written description, and each claims priority to the Original Application. The '723 Patent issued from U.S. Application No. 12/202,524 (the "'524 Application"), which was published on December 25, 2008 as U.S. Patent Application Publication No. 2008/0319914 A1 (the "'914 Publication"). The '713 Patent issued from a division of the '524 Application, and the '979 Patent issued from a continuation of the application that issued as the '713 Patent. Each of the Patents-in-Suit was issued after a full and fair examination by the United States Patent and

Trademark Office. The Patents-in-Suit were valid and in full force and effect during the periods relevant to this action.

26. The Patents-in-Suit disclose novel systems and methods for conducting secure electronic transactions and authorizing access over a network by using user and device identifiers to generate encrypted authorization requests.

27. Benedor is the owner of the entire right, title, and interest in the Patents-in-Suit, including the right to recover for past damages. Benedor has never authorized JPMorgan Chase to practice any of the Patents-in-Suit.

### D. Defendant's Pre-Suit Knowledge of Benedor, Its Technology, and the Patents-in-Suit

28. JPMorgan Chase has known of Benedor, of Mr. Carrott's transactional-security technology, and of the patents and patent applications protecting it since well before the relevant damages period.

29. On information and belief, in or about 2006 to 2008, John F. McGillicuddy, the former Chairman and Chief Executive Officer of Manufacturers Hanover Corporation and of Chemical Banking Corporation, two corporate predecessors of JPMorgan Chase, personally introduced Benedor's transactional-security program to JPMorgan Chase's Chairman and Chief Executive Officer, James Dimon. As Mr. McGillicuddy reported to Benedor, Mr. Dimon acknowledged that the Benedor technology worked but characterized it as "disruptive technology." Benedor's business records from 2014, 2015, and 2017, which recount Mr. McGillicuddy's report, describe that introduction and Mr. Dimon's response. True and correct copies of those records are attached as Exhibit E. Mr. McGillicuddy died in January 2009. *See* In Memoriam: John F. McGillicuddy, Chase Alumni Association, https://www.chasealum.org/article.html?aid=382 (last visited Sept. 10, 2026).

30. In late 2009 and early 2010, consultants Phil Ridgeway and Gino Vezzani, acting on behalf of Benedor (then operating under the trade name SecurPay), presented Benedor's SecurPay system, the commercial embodiment of the inventions claimed in the Patents-in-Suit, to JPMorgan Chase. On November 30, 2009, Benedor's representative transmitted the final SecurPay presentation booklet to Messrs. Ridgeway and Vezzani with authorization to deliver it to their contacts at JPMorgan Chase, and by December 22, 2009 Benedor's JPMorgan Chase contact had distributed the presentation within the bank, including to the bank's chief architect. A true and correct copy of the SecurPay presentation and the related November 30 and December 22, 2009 correspondence is attached as Exhibit D.

31. The SecurPay presentation described the architecture and operation of the patented system in detail, including that the customer's registered device automatically verifies that the application is running on the correct registered device, generates an encrypted identifier string that includes a sequencer, and transmits that encrypted string to the bank for decryption and verification before the bank approves or declines the transaction. The presentation expressly identified the SecurPay program as "Benedor's Patented SecurPay Program" and as "a Patent-Protected Program" covered by "Benedor's United States Patent No. 6,839,692, as well as its divisionals, continuations, and continuations-in-part, including the following Published Applications: USPA 2005-0055317, USPA 2007-0288394, and USPA 2008-0319914." The '914 Publication so identified is the publication of the '524 Application, which issued as the '723 Patent, from which the '713 Patent issued by division, and from which the '979 Patent descends. The presentation named JPMorgan Chase as Benedor's "[f]irst [c]hoice" for an exclusive joint venture.

32. JPMorgan Chase encountered the same Carrott disclosure again, through its own patent-prosecution activity, before and during the relevant damages period. During examination of at least three patent applications owned by JPMorgan Chase Bank, N.A., the United States Patent and Trademark Office examiner cited the ’914 Publication against JPMorgan Chase as prior art. Those applications issued as U.S. Patent No. 10,853,788 (“Systems and Methods for Enhanced Shopping Using a Mobile Device,” issued December 1, 2020), U.S. Patent No. 10,990,941 (“Systems and Methods for Facilitating Payments,” issued April 27, 2021), and U.S. Patent No. 11,100,528 (“System and Method for Implementing a Trusted Identity Broker Solution to Protect Customer Identity,” issued August 24, 2021), each of which lists the ’914 Publication as a cited reference on its face, identified as having been cited by the examiner. True and correct copies of those three patents are attached as Exhibits F, G, and H.

33. The citation against U.S. Application No. 14/699,511, which issued as U.S. Patent No. 10,990,941, was not a passing reference. In a Final Office Action mailed December 20, 2019, the examiner rejected claims 1, 2, 4 through 14, and 28 of that application as obvious over the ’914 Publication (“Carrott”) in view of a secondary reference, relying on Carrott’s disclosure that, among other things, “unique hardware identifiers from customer computer are read” and that the system “compares the current hardware identifiers with the permitted hardware identifiers to determine if the current hardware identifiers are valid.” A true and correct copy of the December 20, 2019 Final Office Action and accompanying Notice of References Cited is attached as Exhibit I. JPMorgan Chase, through its patent-prosecution counsel, necessarily received, reviewed, and responded to the Carrott disclosure in order to prosecute that application to issuance.

34. The ’914 Publication is the published application that issued as the ’723 Patent, from which the ’713 Patent issued by division, and from which the ’979 Patent descends by continuation, and it shares its written description with each of the Patents-in-Suit. On information and belief, in evaluating and responding to the examiner’s rejections over the Carrott reference, JPMorgan Chase’s prosecution counsel reviewed the status and family of the Carrott application and thereby learned that it had issued as the ’723 Patent more than seven years earlier, and learned of the other issued patents in that family, including the ’979 Patent and the ’713 Patent, no later than early 2020. The three citations described above were made by the examiner rather than disclosed by JPMorgan Chase in an information disclosure statement, and Benedor pleads JPMorgan Chase’s knowledge of the Patents-in-Suit themselves on information and belief.

35. Accordingly, JPMorgan Chase has had actual knowledge of Benedor’s technology since at least 2006 to 2008, actual knowledge of the Benedor patent family that includes the Patents-in-Suit, including the ’524 Application from which each of the Patents-in-Suit issued or descends, since at least late 2009, and, on information and belief, actual knowledge of each of the Patents-in-Suit since no later than early 2020, during the periods relevant to this action.

36. On information and belief, despite that knowledge, JPMorgan Chase continued, during the relevant damages period, to make, use, sell, offer for sale, distribute, and support the Accused Instrumentality in a manner that infringed the Patents-in-Suit, without taking a license to the Patents-in-Suit and without designing the Accused Instrumentality around the Patents-in-Suit.

### E. Defendant’s Infringing Activities and the Accused Instrumentality

37. At all times relevant to this case, JPMorgan Chase made, used, sold, offered for sale, distributed, and supported in the United States its mobile banking applications Chase

Mobile (Android package com.chase.sig.android) and J.P. Morgan Mobile (Android package com.jpm.sig.android), which JPMorgan Chase develops, publishes, distributes, and supports for compatible mobile devices through the Google Play Store (Android) and the Apple App Store (iOS).

38. Chase Mobile is JPMorgan Chase's consumer and retail mobile banking application for the Chase brand. During the relevant damages period it enabled customers to view accounts, deposit checks, pay bills, transfer funds, send wire transfers, send and receive person-to-person payments through Chase QuickPay with Zelle, and add Chase cards to digital wallets. As of May 2021, the Google Play listing for Chase Mobile reported more than 10,000,000 installations of the Android application (version 4.201); the listing today reports more than 50,000,000 downloads. *See* Chase Mobile, Google Play (as captured May 30, 2021), https://web.archive.org/web/20210530213510/https://play.google.com/store/apps/details?id=com.chase.sig.android; Chase Mobile, Google Play, *supra*. J.P. Morgan Mobile is JPMorgan Chase's mobile application for its J.P. Morgan Private Bank and J.P. Morgan Wealth Management clients. It is built on the same JPMorgan Chase mobile codebase as Chase Mobile, shares the same authentication and device-trust architecture, and offers the same Zelle, wire-transfer, check-deposit, and digital-wallet functions. *See* J.P. Morgan Mobile, Google Play, *supra*. Both applications are governed by JPMorgan Chase's Digital Services Agreement, which throughout the relevant period identified "Chase Mobile" and "J.P. Morgan Mobile" as digital platforms owned by JPMorgan Chase Bank, National Association. *See* Digital Services Agreement, JPMorgan Chase Bank, N.A. (last updated Sept. 13, 2020) (as captured Dec. 30, 2020), https://web.archive.org/web/20201230021118/https://static.chasecdn.com/content/dam/legal-agreements/library/en/dsa1_la/versions/dsa1_la.pdf; Digital Services Agreement, JPMorgan

Chase Bank, N.A., https://static.chasecdn.com/content/dam/legal-agreements/library/en/dsa1_la/versions/dsa1_la.pdf (last visited Sept. 10, 2026).

39. The Accused Instrumentality requires each customer to authenticate before accessing accounts or authorizing transactions, including by entering a password or passcode through the application's graphical sign-in interface. Since June 2015 (iPhone) and April 2016 (Android), JPMorgan Chase has also offered fingerprint and Touch ID sign-in for Chase Mobile, using the customer's enrolled device-unlock credential to sign in, and it has since added Face ID and Android facial-recognition sign-in. *See* Chase Adds Fingerprint Verification to Android App, American Banker (Apr. 25, 2016), https://www.americanbanker.com/news/chase-adds-fingerprint-verification-to-android-app (reporting the April 2016 Android fingerprint release and noting that Chase had added Touch ID to its iPhone app in June 2015); How We Protect You, Chase, https://www.chase.com/digital/resources/privacy-security/security/how-we-protect-you (last visited Sept. 10, 2026) (the app "supports Apple TouchID, FaceID or Android's fingerprint or facial recognition login").

40. Throughout the relevant damages period, JPMorgan Chase bound each customer's access to a recognized, registered device. JPMorgan Chase's own security disclosures during that period explained that "[w]hen you sign in for the first time or with a device we don't recognize, we'll ask you for your username, password and a temporary identification code," and that "[t]his multistep process helps us protect your accounts and lets us recognize your device the next time you sign in." JPMorgan Chase further explained that it used "128-bit encryption technology to protect your username, password and other personal account information when you're using our site or apps." *See* How We Protect You, Chase (as captured May 30, 2021), https://web.archive.org/web/20210530215616/https://www.chase.com/digital/resources/privacy-

security/security/how-we-protect-you. JPMorgan Chase's current disclosures are to the same effect. *See* How We Protect You, Chase, https://www.chase.com/digital/resources/privacy-security/security/how-we-protect-you (last visited Sept. 10, 2026). JPMorgan Chase now also treats a smartphone that the customer has verified "with the Chase Mobile app in accordance with requirements established by Chase" as a "trusted device," which JPMorgan Chase "may ask you to use ... in order to access your account or for other banking activities, such as sending wire transfers." *See* Trusted Device Enrollment: FAQs & How It Works, Chase, https://www.chase.com/personal/banking/education/basics/trusteddevice (last visited Sept. 10, 2026). JPMorgan Chase's Digital Services Agreement likewise contains an "Identity and Device Verification" provision under which the customer authorizes the disclosure of information about the customer's wireless device to JPMorgan Chase "to help identify you or your wireless device and to help protect against fraud or unauthorized use." *See* Digital Services Agreement (Sept. 13, 2020), *supra*.

41. Benedor's pre-suit investigation, which included analysis of the publicly distributed Android application packages for Chase Mobile and J.P. Morgan Mobile, confirms that these disclosures describe the operation of JPMorgan Chase's own application code and supporting systems, and that both applications share the same authentication and device-trust architecture. On information and belief, that architecture was in place in materially the same form throughout the relevant damages period, as JPMorgan Chase's contemporaneous security disclosures quoted above reflect.

42. During the relevant damages period, the Accused Instrumentality read device-specific hardware identifiers from the customer's device. Each application read identifying information from the device's hardware and operating system, including a device-specific

identifier and the device's hardware make and model, assembled that information into a persistent device identifier and a device-fingerprint signature bound to the particular device, stored the device identifier in encrypted secure storage on the device, and transmitted the device identifier and device signature to JPMorgan Chase with each sign-in request.

43. The Accused Instrumentality determined whether the device and its hardware identifiers were valid before granting protected access or authorizing a transaction. The application would not proceed with credential and token operations unless a valid device identifier was present on the device. JPMorgan Chase's systems evaluated the transmitted device identifier and device signature and returned a device-trust determination identifying whether the device was a recognized, trusted device for the customer. A device that was not recognized as trusted was routed to step-up authentication (including a one-time identification code delivered to the customer) before any sign-in or transaction could complete, and the application's network layer intercepted and blocked protected requests from a device that JPMorgan Chase's systems had not yet validated until the customer completed that additional challenge.

44. The Accused Instrumentality retrieved a user agreement identifier from the storage media of the device. Each application stored on the device, in encrypted secure storage, an encrypted customer identifier that was created only after the customer accepted JPMorgan Chase's governing agreements, including the application's end-user license agreement and JPMorgan Chase's Digital Services Agreement (and, for person-to-person payments, JPMorgan Chase's QuickPay with Zelle terms), and retrieved that stored identifier for each subsequent sign-in and transaction request on a recognized device.

45. The Accused Instrumentality created and transmitted an encrypted user code. Each application assembled the stored, encrypted customer identifier together with the device

identifier and device signature into a single sign-in request, protected that request with application-level encryption and with an encrypted, certificate-pinned connection to JPMorgan Chase's servers, and transmitted it to JPMorgan Chase's authentication systems for an authorization decision. For higher-risk transactions, including Zelle payments, transfers, and bill payments, the application again transmitted the device identifier with the transaction request, and JPMorgan Chase's systems returned a transaction-specific validation before the customer's device was permitted to submit the transaction for completion.

46. The Accused Instrumentality received the authorization decision and, on approval, delivered the requested performance. JPMorgan Chase's systems returned an authorization decision to the customer's device, which the application mapped to an approved, denied, or step-up-required result. On an approved decision, the customer obtained the requested performance: protected access to the customer's accounts, or completion of the requested Zelle payment, transfer, bill payment, or other transaction.

47. For the sign-in and transaction flows described above, JPMorgan Chase's own systems acted both as the "provider" that received the encrypted user code from the customer's device and as the "verification entity" that performed the device-trust and authorization decision. For Chase QuickPay with Zelle person-to-person payments, JPMorgan Chase's app-facing payment systems were the provider and the authorization decision was made through the Zelle network, which is operated by Early Warning Services, LLC and of which JPMorgan Chase has been a participating financial institution since June 2017. *See* Chase Launches QuickPay with Zelle, JPMorgan Chase (June 14, 2017), https://media.chase.com/news/chase-launches-quickpay-with-zelle (last visited Sept. 10, 2026).

48. During the relevant damages period, JPMorgan Chase also used the Accused Instrumentality to enable its customers to make purchase transactions with merchants without transmitting their card numbers, in two ways: through Chase Pay, and through Chase cards that JPMorgan Chase, as the card issuer, provisioned to and authorized from its customers' mobile devices. Through March 31, 2021, JPMorgan Chase offered Chase Pay, a checkout method available on participating merchants' websites and in their mobile applications, under which a customer selected Chase Pay at the merchant's checkout, signed in with the customer's existing Chase username and password, and paid with a preloaded eligible Chase card, JPMorgan Chase using "tokenized payments to keep your card numbers secure." *See* Chase Pay, Chase (as captured Nov. 12, 2020), https://web.archive.org/web/20201112031515/https://www.chase.com/digital/digital-payments/chase-pay ("There's no need to set up a new account to use Chase Pay. Just enter your existing Chase.com username and password to pay easily."); Where to Use Chase Pay, Chase (as captured Mar. 12, 2021), https://web.archive.org/web/20210312151433/https://www.chase.com/digital/digital-payments/chase-pay (stating that "Chase Pay will be removed from all merchant apps and websites by 3/31/21" and listing the Shell, Starbucks, and Walmart applications and websites as accepting merchants).

49. Throughout the relevant damages period, JPMorgan Chase, as the card issuer, provisioned its customers' Chase cards to the Apple Pay and Google Pay digital wallets on the customers' mobile devices and authorized the purchase transactions made with those provisioned cards. JPMorgan Chase has been a participating Apple Pay card issuer since Apple Pay launched on October 20, 2014. *See* Apple Pay Set to Transform Mobile Payments Starting October 20,

Apple (Oct. 16, 2014), https://www.apple.com/newsroom/2014/10/16Apple-Pay-Set-to-Transform-Mobile-Payments-Starting-October-20/ (listing Chase among the banks supporting Apple Pay at launch). When a customer adds a Chase card to Apple Pay, "the number from your plastic credit, debit or Chase Liquid card is replaced with a secure device account number (also called a token). This token is passed onto the merchant for payment instead of your actual card number." *See* Using Your Chase Card with Apple Pay FAQs, Chase (as captured Apr. 20, 2021), https://web.archive.org/web/20210420143218/https://www.chase.com/digital/digital-payments/apple-pay/faqs/using-your-chase; Using Your Chase Card with Apple Pay FAQs, Chase, https://www.chase.com/digital/digital-payments/apple-pay/faqs/using-your-chase (last visited Sept. 10, 2026). As Apple explained during the relevant period, after the card is approved, "your bank, your bank's authorized service provider, or your card issuer creates a device-specific Device Account Number, encrypts it, and sends it along with other data (such as the key used to generate dynamic security codes that are unique to each transaction)" for storage in the Secure Element of the customer's device; for each purchase, after the customer authenticates with Face ID, Touch ID, or a passcode, "the Secure Element provides your Device Account Number and a transaction-specific dynamic security code to the store's point of sale terminal"; and "[b]efore they approve the payment, your bank, card issuer, or payment network can verify your payment information by checking the dynamic security code to make sure that it's unique and tied to your device." *See* Apple Pay Security and Privacy Overview, Apple (as captured May 24, 2021), https://web.archive.org/web/20210524143214/https://support.apple.com/en-us/HT203027. JPMorgan Chase told its customers during the same period that "[w]ith FaceID or TouchID, only you or your registered users can approve a purchase" and that "[y]our card number is never shared with the merchant or stored on your device." *See* Chase and Apple Pay, Chase (as

captured May 30, 2021), https://web.archive.org/web/20210530215255/https://www.chase.com/digital/digital-payments/apple-pay; *see also* Chase and Google Pay, Chase (as captured May 30, 2021), https://web.archive.org/web/20210530222052/https://www.chase.com/digital/digital-payments/google-pay ("Almost all purchases require you to unlock your phone. Your card number is never shared with the merchant or stored on your device."). Consistent with the EMV payment tokenization framework that these wallets implement, the device generates for each purchase a token cryptogram, that is, "[a] cryptogram, containing a transaction-unique value, typically generated using the payment token, payment-token-related data, and transaction data," and the EMV payment application on the device maintains an application transaction counter, incremented with each transaction, whose value is among the transaction-specific data from which each cryptogram is generated. *See* U.S. Payments Forum, EMV Payment Tokenization Primer and Lessons Learned 41 (June 2019), https://www.uspaymentsforum.org/wp-content/uploads/2019/06/EMV-Payment-Tokenization-Primer-Lessons-Learned-FINAL-June-2019.pdf; Smart Card Alliance, Technologies for Payment Fraud Prevention: EMV, Encryption and Tokenization 7 (Oct. 2014), https://www.securetechalliance.org/wp-content/uploads/EMV-Tokenization-Encryption-WP-v51-102414-FINAL-clean.pdf.

50. The Chase Mobile and J.P. Morgan Mobile applications themselves allow a signed-in customer to add the customer's Chase cards to those wallets directly from within the application. *See* Digital Wallet, Chase (as captured Aug. 2, 2021), https://web.archive.org/web/20210802071715/https://www.chase.com/digital/customer-service/helpful-tips/online-banking/mobile/digital-wallet ("Add your Chase cards to your digital wallet in the Chase Mobile app."); How To Use a Digital Wallet, Chase,

https://www.chase.com/digital/customer-service/helpful-tips/online-banking/mobile/digital-wallet (last visited Sept. 10, 2026) ("Add your cards to Apple Pay, Google Pay and PayPal digital wallets right from the Chase Mobile app"). In that flow, the customer first signs in to the application on a recognized device; the application then requests provisioning of the selected card, and JPMorgan Chase, as issuer, approves the provisioning request and, directly or through its authorized service provider, provisions the device-specific payment credential to the customer's device. *See* In-App Provisioning, Apple Pay Demo, Apple, https://applepaydemo.apple.com/in-app-provisioning (last visited Sept. 10, 2026) ("Apple Pay In-App Provisioning enables issuers of transit, access, and payment cards to provision into Apple Wallet directly from the issuer's iOS app."). When it retired Chase Pay, JPMorgan Chase stated that it was "incorporating the most popular features directly into the Chase mobile app and Chase.com," including direct provisioning of Chase cards to partner wallets. *See* Robert Freedman, JPMorgan to Pull Chase Pay from Merchant Apps, Sites March 31, Payments Dive (Mar. 10, 2021), https://www.paymentsdive.com/news/jpmorgan-chase-sunset-merchant-apps-sites-march-31/596398/; JPMorgan to Discontinue Support for Chase Pay by End of March, Crowdfund Insider (Mar. 10, 2021), https://www.crowdfundinsider.com/2021/03/173040-jpmorgan-to-discontinue-support-for-chase-pay-by-end-of-march-shell-starbucks-walmart-customers-will-be-affected/. Purchases made with Chase cards provisioned to those wallets are governed by JPMorgan Chase's terms for adding a Chase card to a third-party digital wallet and by the customer's Chase cardmember or deposit account agreement. *See* Terms for Adding Your Chase Card to a Third Party Digital Wallet, Chase (as captured May 31, 2021), https://web.archive.org/web/20210531002438/https://www.chase.com/digital/digital-payments/disclosures/terms-conditions; Terms for Adding Your Chase Card to a Third Party

Digital Wallet, Chase, https://www.chase.com/digital/digital-payments/disclosures/terms-conditions (last visited Sept. 10, 2026).

51. JPMorgan Chase's own disclosures confirm the scale at which customers used the Accused Instrumentality during the relevant period. JPMorgan Chase reported approximately 39.0 million active mobile customers and 54.5 million active digital customers as of June 30, 2020; approximately 40.9 million active mobile customers and 55.3 million active digital customers as of December 31, 2020; approximately 45.5 million active mobile customers and 58.9 million active digital customers as of December 31, 2021; and approximately 46.5 million active mobile customers and 60.3 million active digital customers as of March 31, 2022. *See* JPMorgan Chase & Co., Earnings Release Financial Supplement, Second Quarter 2020, Current Report (Form 8-K), Ex. 99.2, https://www.sec.gov/Archives/edgar/data/19617/000001961720000362/a2q20erfexhibit992supp.htm; JPMorgan Chase & Co., Earnings Release Financial Supplement, Fourth Quarter 2020, Current Report (Form 8-K), Ex. 99.2, https://www.sec.gov/Archives/edgar/data/19617/000001961721000071/a4q20erfex992supplement.htm; JPMorgan Chase & Co., Earnings Release Financial Supplement, First Quarter 2022, Current Report (Form 8-K), Ex. 99.2, https://www.sec.gov/Archives/edgar/data/19617/000001961722000313/a1q22erfex992supplement.htm. Throughout the relevant damages period, tens of millions of JPMorgan Chase customers thus used the Accused Instrumentality to authenticate themselves and to authorize payments and transfers.

52. JPMorgan Chase derives substantial revenue and strategic benefit from the Accused Instrumentality. On information and belief, the secure sign-in and transaction-

authorization features of the Accused Instrumentality reduce JPMorgan Chase's fraud losses, reduce its servicing costs relative to branch and telephone channels, and increase customer acquisition, engagement, and retention. These benefits are directly attributable to the infringing authentication and transaction-authorization features of the Accused Instrumentality, which are technically necessary for customers to access their accounts and transact through the applications.

### F. Defendant's Conditioning of User and Network Participation in the Accused Instrumentality

53. During the relevant damages period, JPMorgan Chase conditioned a customer's receipt of the benefits of the Accused Instrumentality on the performance of specific steps, in the manner and at the timing established by JPMorgan Chase, including by contract, by technical design, and by user-interface and software design.

54. To obtain mobile access to a Chase or J.P. Morgan account, and to use Chase QuickPay with Zelle, transfers, and bill payments through the applications, a customer was required to download the Chase Mobile or J.P. Morgan Mobile application; to accept the application's end-user license agreement and JPMorgan Chase's Digital Services Agreement (and, for person-to-person payments, JPMorgan Chase's QuickPay with Zelle terms); and to allow the application to collect the device identifiers described above and to pass JPMorgan Chase's device-trust and step-up authentication. Only after the customer accepted those agreements was the stored customer identifier created. A customer who declined any of these steps was denied the benefit: access was blocked, an unrecognized device received a step-up challenge rather than access, and the application's network layer cancelled protected requests from a device that JPMorgan Chase's systems had not validated.

55. JPMorgan Chase's own software dictated the manner and timing of each step. JPMorgan Chase's software determined which device identifiers were read and how the device signature was assembled; how and when the device-validity determination ran; how the sign-in and transaction requests were assembled and encrypted; and the endpoint and timing of each transmission. The customer merely supplied a password or biometric and tapped; JPMorgan Chase's software performed and sequenced every other step.

56. For Chase QuickPay with Zelle, Early Warning Services, LLC, as the operator of the Zelle network, performed its part of the authorization process pursuant to JPMorgan Chase's participation in the Zelle network and the JPMorgan Chase-imposed QuickPay with Zelle terms that the customer was required to accept.

57. For purchase transactions, JPMorgan Chase likewise dictated the manner and timing of each step. A customer could pay a merchant through Chase Pay only by signing in with the customer's Chase credentials through JPMorgan Chase's checkout flow. A customer could pay a merchant with a Chase card from the customer's device only if JPMorgan Chase, as the card issuer, approved the provisioning of that card to that device (including, for in-application provisioning, only after the customer signed in to the application on a recognized device), created and delivered the device-specific payment credential and key to the device, and thereafter authorized the purchase after verifying the transaction-specific code that the device generated with that credential. JPMorgan Chase's terms for adding a Chase card to a third-party digital wallet, its cardmember and deposit account agreements, and its Digital Services Agreement governed each such purchase. Merchants, acquirers, payment networks, token service providers, and digital-wallet providers performed their parts of each purchase transaction pursuant to

JPMorgan Chase's participation in the payment networks and wallet programs and its provisioning of the payment credential to the customer's device.

58. JPMorgan Chase's contractual, technical, and design controls over the customer's device and over every Accused Instrumentality transaction established the manner and timing of each participant's performance of the steps of the asserted claims of the Patents-in-Suit and conditioned each participant's receipt of the benefits of the Accused Instrumentality on that performance, within the meaning of *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) (en banc).

## III. COUNT I: INFRINGEMENT OF THE '979 PATENT

59. Benedor incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

60. JPMorgan Chase directly infringed one or more claims of the '979 Patent during the relevant damages period, literally and/or under the doctrine of equivalents, by making, using, selling, offering to sell, and/or supporting the Accused Instrumentality in the United States, in violation of 35 U.S.C. § 271(a).

61. For example, during the relevant damages period, the Accused Instrumentality, in conjunction with JPMorgan Chase's supporting systems, practiced every step of the method of at least Claim 19 of the '979 Patent. Claim 19 recites a method comprising: reading, by a processor, a hardware identifier from hardware of a computerized device; determining, by said processor, whether said hardware identifier is valid; based on said hardware identifier being valid, retrieving, by said processor, a user agreement identifier that identifies a user from a storage media of said computerized device; creating, by said processor, an encrypted user code by encrypting said user agreement identifier and said hardware identifier; transmitting, by an input and output device of said computerized device, said encrypted user code to a provider in a

transaction request for a transaction authorization decision over a computer network; receiving, by said input and output device, said transaction authorization decision from said provider; and receiving, by said user, performance of said transaction request from said provider, based on said transaction authorization decision approving said transaction request.

62. The Accused Instrumentality performed each element of Claim 19 of the '979 Patent, including:

a. reading a hardware identifier from the hardware of the customer's mobile device, including the device-specific identifier and hardware make and model that the application assembled into its persistent device identifier and device-fingerprint signature;

b. determining whether the hardware identifier was valid, in that the application would not proceed without a valid stored device identifier and JPMorgan Chase's systems evaluated the transmitted device identifier and device signature and returned a determination whether the device was a recognized, trusted device for the customer, routing an unrecognized device to step-up authentication and blocking protected requests until the device was validated;

c. based on the hardware identifier being valid, retrieving from the device's encrypted secure storage a user agreement identifier that identifies the customer, namely the stored, encrypted customer identifier created upon the customer's acceptance of JPMorgan Chase's end-user license agreement and Digital Services Agreement;

d. creating an encrypted user code by encrypting the user agreement identifier and the hardware identifier, in that the application assembled the encrypted customer identifier together with the device identifier and device signature into a single encrypted sign-in or transaction request;

e. transmitting the encrypted user code to a provider, namely JPMorgan Chase's authentication and transaction-authorization systems, in a transaction request (a sign-in, Zelle payment, transfer, or bill payment) for a transaction authorization decision over a computer network;

f. receiving the transaction authorization decision from the provider at the customer's device, which the application mapped to an approved, denied, or step-up-required result; and

g. the customer receiving performance of the transaction request from the provider, namely protected access to the customer's accounts or completion of the requested payment or transfer, based on the transaction authorization decision approving the request.

63. To the extent any step of Claim 19 of the '979 Patent was performed by a customer, by the customer's device, by Early Warning Services, LLC, or by another third party rather than by JPMorgan Chase itself, performance of that step is attributable to JPMorgan Chase as the single direct infringer under *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) (en banc), because JPMorgan Chase conditioned each such participant's participation in the Accused Instrumentality, and receipt of its benefits, on the performance of those steps, and JPMorgan Chase established the manner and timing of that performance through its end-user license agreement, its Digital Services Agreement and

QuickPay with Zelle terms, its user-facing application interfaces, and its device-trust, step-up authentication, encrypted-transmission, and payment-authorization protocols described above.

64. JPMorgan Chase has indirectly infringed the ’979 Patent by inducing infringement under 35 U.S.C. § 271(b). With knowledge of the ’979 Patent as alleged above, JPMorgan Chase actively and knowingly encouraged and instructed customers to use the Accused Instrumentality in a manner that infringed the ’979 Patent, including through its end-user license agreement, its Digital Services Agreement and QuickPay with Zelle terms, its application setup and onboarding flows, its in-app instructions and support materials, and its published instructions for use of the Accused Instrumentality, with knowledge that the encouraged acts constituted infringement of the ’979 Patent.

65. JPMorgan Chase has indirectly infringed the ’979 Patent by contributing to infringement under 35 U.S.C. § 271(c). With knowledge of the ’979 Patent as alleged above, JPMorgan Chase made, sold, offered for sale, distributed, and supported specially adapted components of the Accused Instrumentality, including the Chase Mobile and J.P. Morgan Mobile client software, its device-identification, device-trust, and step-up authentication logic, its encrypted-credential assembly and transmission logic, and the supporting authentication and payment-authorization systems. Each such component was a material component of the invention claimed in the ’979 Patent, was especially made and adapted for use in an infringing manner, was not a staple article or commodity of commerce, and had no substantial non-infringing use.

66. JPMorgan Chase’s infringement of the ’979 Patent was willful. As alleged above, JPMorgan Chase had actual knowledge of Benedor’s technology and of the Benedor patent family that includes the ’979 Patent since at least 2009, and, on information and belief, actual

knowledge of the ’979 Patent itself since no later than early 2020, when its prosecution counsel responded to the examiner’s rejection of JPMorgan Chase’s own patent claims over the Carrott disclosure that the ’979 Patent shares. Despite that knowledge, JPMorgan Chase continued, during the relevant damages period, to make, use, sell, offer for sale, distribute, and support the Accused Instrumentality in a manner that infringed the ’979 Patent, without taking a license to the ’979 Patent and without designing the Accused Instrumentality around the ’979 Patent.

67. As a direct and proximate result of JPMorgan Chase’s infringement of the ’979 Patent, Benedor has suffered damages.

## IV. COUNT II: INFRINGEMENT OF THE ’713 PATENT

68. Benedor incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

69. JPMorgan Chase directly infringed one or more claims of the ’713 Patent during the relevant damages period, literally and/or under the doctrine of equivalents, by making, using, selling, offering to sell, and/or supporting the Accused Instrumentality in the United States, in violation of 35 U.S.C. § 271(a).

70. For example, during the relevant damages period, the Accused Instrumentality, in conjunction with JPMorgan Chase’s supporting systems, practiced every step of the method of at least Claim 13 of the ’713 Patent. Claim 13 recites a method comprising: receiving, into a graphic user interface of a computerized device, an entered password from a user; determining, by a processor, whether said entered password is valid based on whether said entered password matches at least one permitted password; based on said password being valid, reading, by said processor, a hardware identifier from hardware of said computerized device; determining, by said processor, whether said hardware identifier is valid based on whether said hardware identifier matches at least one permitted hardware identifier; based on said hardware identifier

being valid, retrieving, by said processor, a user agreement identifier from a storage media of said computerized device, said user agreement identifier identifying an agreement between said user and a verification entity; creating, by said processor, an encrypted user code by encrypting said user agreement identifier and said hardware identifier, each said encrypted code being valid only for a single request for an authorization decision; transmitting, by an input and output device of said computerized device, said encrypted user code to a provider in a request for an authorization decision over a computer network, said encrypted user code being sent by said provider to said verification entity for an authorization decision; and receiving, by said input and output device, said authorization decision from said provider.

71. The Accused Instrumentality performed each element of Claim 13 of the ’713 Patent, including:

a. receiving, into the application’s graphical sign-in interface on the customer’s mobile device, a password or passcode entered by the customer (or the customer’s enrolled fingerprint or facial-recognition credential used to release the customer’s stored sign-in credential);

b. determining whether the entered password was valid based on whether it matched a permitted password for the customer’s account, the result of which determination was returned to and acted upon by the customer’s device;

c. based on the password being valid, reading a hardware identifier from the hardware of the customer’s device, including the device-specific identifier and hardware make and model that the application assembled into its persistent device identifier and device-fingerprint signature;

d. determining whether the hardware identifier was valid based on whether it matched a permitted hardware identifier, in that JPMorgan Chase's systems compared the transmitted device identifier and device signature against the devices registered as trusted for the customer and returned a determination whether the device was a recognized, trusted device, routing an unrecognized device to step-up authentication;

e. based on the hardware identifier being valid, retrieving from the device's encrypted secure storage a user agreement identifier identifying the agreement between the customer and the verification entity, namely the stored, encrypted customer identifier created upon the customer's acceptance of JPMorgan Chase's Digital Services Agreement (and, for Zelle payments, JPMorgan Chase's QuickPay with Zelle terms);

f. creating an encrypted user code by encrypting the user agreement identifier and the hardware identifier, each such encrypted code being valid only for a single request for an authorization decision, in that the application assembled the encrypted customer identifier together with the device identifier and device signature into a single encrypted, request-specific sign-in or transaction request bearing a per-request transaction identifier that could not be replayed for a second request;

g. transmitting the encrypted user code to a provider, namely JPMorgan Chase's app-facing authentication and payment systems, in a request for an authorization decision over a computer network, from which the encrypted user code was passed to the verification entity, namely

JPMorgan Chase's device-trust and authorization systems (or, for Zelle payments, the Zelle network operated by Early Warning Services, LLC), for the authorization decision; and

h. receiving the authorization decision from the provider at the customer's device.

72. To the extent any step of Claim 13 of the '713 Patent was performed by a customer, by the customer's device, by Early Warning Services, LLC, or by another third party rather than by JPMorgan Chase itself, performance of that step is attributable to JPMorgan Chase as the single direct infringer under *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) (en banc), for the reasons set forth above.

73. JPMorgan Chase has indirectly infringed the '713 Patent by inducing infringement under 35 U.S.C. § 271(b) and by contributing to infringement under 35 U.S.C. § 271(c), in each case with knowledge of the '713 Patent as alleged above. JPMorgan Chase's inducing acts include actively and knowingly encouraging and instructing customers to use the Accused Instrumentality in an infringing manner through its end-user license agreement, its Digital Services Agreement and QuickPay with Zelle terms, its application setup and onboarding flows, and its published instructions for use. JPMorgan Chase's contributory acts include the making, sale, offer for sale, distribution, and support of the Chase Mobile and J.P. Morgan Mobile client software, its device-identification, device-trust, and step-up authentication logic, its encrypted-credential assembly and transmission logic, and the supporting authentication and payment-authorization systems, each of which was a material component of the invention claimed in the '713 Patent, was especially made and adapted for use in an infringing manner, was not a staple article or commodity of commerce, and had no substantial non-infringing use.

74. JPMorgan Chase's infringement of the '713 Patent was willful. As alleged above, JPMorgan Chase had actual knowledge of Benedor's technology and of the Benedor patent family that includes the '713 Patent since at least 2009, when the SecurPay presentation delivered to JPMorgan Chase identified the published application from which the '713 Patent issued, and, on information and belief, actual knowledge of the '713 Patent itself since no later than early 2020, when its prosecution counsel responded to the examiner's December 20, 2019 rejection of JPMorgan Chase's own patent claims over that same application's publication. Despite that knowledge, JPMorgan Chase continued, during the relevant damages period, to make, use, sell, offer for sale, distribute, and support the Accused Instrumentality in a manner that infringed the '713 Patent, without taking a license to the '713 Patent and without designing the Accused Instrumentality around the '713 Patent.

75. As a direct and proximate result of JPMorgan Chase's infringement of the '713 Patent, Benedor has suffered damages.

## V. COUNT III: INFRINGEMENT OF THE '723 PATENT

76. Benedor incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

77. JPMorgan Chase directly infringed one or more claims of the '723 Patent during the relevant damages period, literally and/or under the doctrine of equivalents, by making, using, selling, offering to sell, and/or supporting the Accused Instrumentality in the United States, in violation of 35 U.S.C. § 271(a).

78. For example, during the relevant damages period, the Accused Instrumentality, in conjunction with JPMorgan Chase's supporting systems, practiced every step of the method of at least Claim 1 of the '723 Patent. Claim 1 recites a method comprising: receiving a password from a customer operating an electronic device into a graphic user interface of said electronic

device; determining whether said password is valid by a processor of said electronic device; based on said determining whether said password is valid, reading a plurality of hardware identifiers from hardware of said electronic device, by said processor, said plurality of hardware identifiers comprising at least a portion of a serial number of at least one hardware component of said electronic device; determining whether said plurality of hardware identifiers are valid, by said processor by comparing said read hardware identifiers with a list of permitted hardware identifiers; based on said determining of whether said plurality of hardware identifiers are valid, retrieving a customer identifier string from a storage media of said electronic device, by said processor; updating a count value by said processor, by incrementing a sequencer maintained by said electronic device; creating an encrypted customer code by encrypting said customer identifier string, said plurality of hardware identifiers, and said count value, by said processor; and transmitting said encrypted customer code to a merchant in a purchase transaction over a computer network, instead of customer credit card information, by an input and output device of said electronic device, receiving an authorization for said purchase transaction from said merchant by said electronic device.

79. The Accused Instrumentality performed each element of Claim 1 of the ’723 Patent, with a customer’s purchase from a merchant using a Chase card that JPMorgan Chase provisioned to the customer’s mobile device (or, through March 31, 2021, using Chase Pay) as the charged purchase transaction, including:

a. receiving a password from the customer operating the customer’s mobile device into a graphic user interface of the device, namely the device passcode, or the enrolled fingerprint or facial-recognition credential that releases it, that the customer entered to approve the purchase, and the

password or passcode (or enrolled biometric credential) that the customer entered into the Chase Mobile or J.P. Morgan Mobile sign-in interface to provision the card to the device, and, for Chase Pay, the customer's Chase username and password entered at the merchant's checkout;

b. determining, by a processor of the device, whether the password was valid, in that the device validated the entered passcode or biometric credential before releasing the provisioned payment credential for the purchase, and the result of JPMorgan Chase's validation of the customer's sign-in password was returned to and acted upon by the device before any card could be provisioned to it;

c. based on the password being valid, reading a plurality of hardware identifiers from the hardware of the device, comprising at least a portion of a serial number of at least one hardware component of the device, including the identifiers of the secure element in which the provisioned payment credential and its device-bound key were stored and to which they were cryptographically bound, and, on Android devices, the Android device identifier ("android_id") assigned to and exposed for the device by its operating system, together with the device's hardware make and model, which the Chase Mobile and J.P. Morgan Mobile applications read and assembled into the persistent device identifier and device-fingerprint signature transmitted to JPMorgan Chase;

d. determining whether the plurality of hardware identifiers were valid by comparing the read hardware identifiers with a list of permitted hardware

identifiers, in that the device would release the provisioned credential only on the device to which JPMorgan Chase had provisioned and bound it, JPMorgan Chase and its authorized service provider maintained the record of the devices to which each customer's card had been provisioned and verified at authorization that the transaction-specific code was generated by, and tied to, one of those devices, and JPMorgan Chase's systems compared the device identifier and device signature transmitted by the application against the devices registered as trusted for the customer before permitting in-application provisioning;

e. based on the hardware identifiers being valid, retrieving a customer identifier string from the storage media of the device, namely the device-specific Device Account Number (payment token) that JPMorgan Chase, as issuer, created for the customer's card and that identified the customer's enrolled card account, stored in the device's secure element, and, for in-application provisioning, the stored, encrypted customer identifier created upon the customer's acceptance of JPMorgan Chase's governing agreements;

f. updating a count value by incrementing a sequencer maintained by the device, namely the Application Transaction Counter that the payment credential provisioned to the device incremented for each purchase transaction and used as an input to the transaction-specific code;

g. creating an encrypted customer code by encrypting the customer identifier string, the plurality of hardware identifiers, and the count value, namely

the transaction-specific dynamic security code (cryptogram) that the device generated for each purchase from the Device Account Number, the device-bound key that JPMorgan Chase had provisioned to that device, and the transaction counter, which code was valid only for that single purchase and, as JPMorgan Chase's own materials state, was checked "to make sure that it's unique and tied to your device"; and

h. transmitting the encrypted customer code to a merchant in a purchase transaction over a computer network, instead of customer credit card information, and receiving an authorization for the purchase transaction from the merchant, in that the device transmitted the Device Account Number and transaction-specific code to the merchant, in a store or in the merchant's application or website, "instead of your actual card number," the merchant routed them through its acquirer and the payment network to JPMorgan Chase for authorization, and the device received the merchant's authorization of the purchase (and, for Chase Pay, the device transmitted JPMorgan Chase's tokenized payment to the merchant in place of the customer's card number and received the merchant's authorization).

80. JPMorgan Chase itself performed or directed and controlled each of those steps. As the card issuer, JPMorgan Chase decided whether to approve each provisioning of a Chase card to a customer's device, including after the customer's authenticated sign-in to the Chase Mobile or J.P. Morgan Mobile application; created, directly or through its authorized service provider, the device-specific Device Account Number and the key used to generate the transaction-specific codes, and caused them to be delivered to and stored in the customer's

device; set the terms under which the provisioned card could be used; and authorized or declined each purchase after verifying that the transaction-specific code was unique and tied to the customer's device. Through the Chase Mobile and J.P. Morgan Mobile applications, JPMorgan Chase also performed the sign-in, device-identification, and device-trust steps on which in-application provisioning depended, and JPMorgan Chase operated the Chase Pay checkout flow in its entirety.

81. In the alternative, JPMorgan Chase directly infringed at least Claim 7 of the '723 Patent, a non-transitory computer storage medium claim, by making, using, selling, offering for sale, distributing, and supporting in the United States, during the relevant damages period, the Chase Mobile and J.P. Morgan Mobile applications, together with the payment credentials that JPMorgan Chase provisioned through and alongside them, which are stored on non-transitory computer storage media of customers' devices and which store instructions executable by the device to perform the method recited in Claim 7, including receiving and validating a password, reading a plurality of hardware identifiers comprising at least a portion of a serial number of at least one hardware component, comparing them against a list of permitted hardware identifiers, retrieving a customer identifier string, updating a count value by incrementing a sequencer maintained by the device, creating an encrypted customer code encrypting the customer identifier string, the plurality of hardware identifiers, and the count value, transmitting the encrypted customer code to a merchant in a purchase transaction instead of customer credit card information, and receiving an authorization for the purchase transaction.

82. To the extent any of the foregoing steps or elements of Claim 1 or Claim 7 of the '723 Patent are not found to be literally infringed, the Accused Instrumentality infringed under the doctrine of equivalents because each unmet element was performed by a corresponding

element that performed substantially the same function, in substantially the same way, to achieve substantially the same result. Without limitation: (i) to the extent the secure-element identifiers, device-bound key material, or Android device identifier read by the Accused Instrumentality are not found to be literally "at least a portion of a serial number of at least one hardware component" of the device, each is the equivalent of such a serial-number portion, because it performs substantially the same function (uniquely and persistently identifying the particular device for transaction-binding purposes), in substantially the same way (a stable identifying value assigned to and retained by the device hardware and readable by the device's processor), to achieve substantially the same result (binding the credential and the transaction to the specific device); (ii) to the extent the device-side binding of the provisioned credential and JPMorgan Chase's verification that the transaction-specific code is tied to the provisioned device are not found to be literally a comparison, by the device's processor, against a "list of permitted hardware identifiers," they are the equivalent of such a comparison, performing substantially the same function, in substantially the same way, to achieve substantially the same result; and (iii) to the extent the "updating a count value by ... incrementing a sequencer maintained by said electronic device" element is not literally met by the Application Transaction Counter, the per-transaction counter and the request-specific transaction identifier carried by each request are the equivalent of the claimed locally incremented sequencer, performing substantially the same function, in substantially the same way, to achieve substantially the same single-use result.

83. To the extent any step of Claim 1 or Claim 7 of the '723 Patent was performed by a customer, by the customer's device, by a merchant, acquirer, payment network, token service provider, or digital-wallet provider, or by another third party rather than by JPMorgan Chase itself, performance of that step is attributable to JPMorgan Chase as the single direct infringer

under *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) (en banc), because JPMorgan Chase conditioned the customer's ability to pay merchants with a Chase card from the customer's device, and each other participant's participation in those purchase transactions, on the performance of those steps, and established the manner and timing of that performance through its provisioning approvals, the credential and key it provisioned to the device, its terms for adding a Chase card to a third-party digital wallet, its cardmember and deposit account agreements, its Chase Pay checkout flow, and its per-transaction authorization, for the reasons set forth above.

84. JPMorgan Chase has indirectly infringed the '723 Patent by inducing infringement under 35 U.S.C. § 271(b) and by contributing to infringement under 35 U.S.C. § 271(c), in each case with knowledge of the '723 Patent as alleged above. JPMorgan Chase's inducing acts include actively and knowingly encouraging and instructing customers to add their Chase cards to Apple Pay and Google Pay and to pay merchants with them, including from within the Chase Mobile and J.P. Morgan Mobile applications, through its digital-wallet web pages, frequently asked questions, in-application enrollment flows, and terms, and, through March 31, 2021, encouraging and instructing customers to pay merchants through Chase Pay. JPMorgan Chase's contributory acts include the making, sale, offer for sale, distribution, and support of the Chase Mobile and J.P. Morgan Mobile client software, its device-identification, device-trust, and step-up authentication logic, its payment-provisioning logic, the device-specific payment credentials and keys it provisioned to customers' devices, and the supporting authentication, provisioning, and payment-authorization systems, each of which was a material component of the invention claimed in the '723 Patent, was especially made and adapted for use

in an infringing manner, was not a staple article or commodity of commerce, and had no substantial non-infringing use.

85. JPMorgan Chase's infringement of the '723 Patent was willful. As alleged above, JPMorgan Chase had actual knowledge of Benedor's technology and of the Benedor patent family that includes the '723 Patent since at least 2009, when the SecurPay presentation delivered to JPMorgan Chase identified the '914 Publication, the published application that issued as the '723 Patent, and, on information and belief, actual knowledge of the '723 Patent itself since no later than early 2020, when its prosecution counsel responded to the examiner's December 20, 2019 rejection of JPMorgan Chase's own patent claims over that publication, which had by then issued as the '723 Patent more than seven years earlier. Despite that knowledge, JPMorgan Chase continued, during the relevant damages period, to make, use, sell, offer for sale, distribute, and support the Accused Instrumentality in a manner that infringed the '723 Patent, without taking a license to the '723 Patent and without designing the Accused Instrumentality around the '723 Patent.

86. As a direct and proximate result of JPMorgan Chase's infringement of the '723 Patent, Benedor has suffered damages.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff BenedorTSE, LLC respectfully requests that this Court enter judgment in its favor and against Defendant JPMorgan Chase Bank, N.A., and grant the following relief:

A. A judgment that JPMorgan Chase has infringed one or more claims of the '979 Patent, the '713 Patent, and the '723 Patent;

B. An award of damages adequate to compensate Benedor for JPMorgan Chase's infringement, in an amount to be proven at trial, but in no event

less than a reasonable royalty for the use made of the inventions by JPMorgan Chase, together with interest and costs as fixed by the Court under 35 U.S.C. § 284;

C. A judgment that JPMorgan Chase's infringement of the Patents-in-Suit has been willful, and an order enhancing the damages awarded up to three times the amount found or assessed, pursuant to 35 U.S.C. § 284;

D. A judgment that this case is exceptional and an award to Benedor of its reasonable attorneys' fees, pursuant to 35 U.S.C. § 285;

E. An award of pre-judgment and post-judgment interest on the damages awarded; and

F. Such other and further relief as the Court may deem just and proper.

## I. JURY DEMAND

Plaintiff BenedorTSE, LLC hereby demands a trial by jury on all issues so triable.

Dated: September 18, 2026

Respectfully submitted,

*_/s/ W. David Bridgers_*
W. David Bridgers (TN BPR #16603)
Chanelle R. Acheson (TN BPR #30008)
Ira C. Waddey (TN BPR #2665)
G. Edward Powell III (TN BPR #43915)
Waddey Acheson LLC
1030 16th Ave South, Suite 300
Nashville, TN 37212
615-839-1100
david@waddeyacheson.com
*Counsel for Plaintiff BenedorTSE, LLC*